# IN THE TAX COURT OF THE
# STATE OF OREGON

## POLK COUNTY
*v.*
## DEPARTMENT OF REVENUE
*and*
## CAPITAL MANOR, INC.,
*Intervenor*
## (TC 4226)

David Doyle, Polk County Legal Counsel, Dallas, represented Plaintiff (county).

Joseph Laronge, Assistant Attorney General, Department of Justice, Salem, filed an Answer but did not appear at trial on behalf of Defendant (the department).

James C. Griggs, Saalfield, Griggs, Gorsuch, Alexander, & Emerick, Salem, represented Intervenor (taxpayer).

Decision for Intervenor rendered May 6, 1999.

### CARL N. BYERS, Judge.

Plaintiff (county) appeals from Defendant's Opinion and Orders reducing the assessed value of a large retirement complex for tax years 1993-94, 1994-95, and 1995-96. County asserts that the real market value as determined under ORS 308.490[1] is substantially greater than the amount determined by Defendant. The property owner, Capital Manor, Inc. (the Manor), intervened and defended at trial.

## FACTS

The Manor is a nonprofit corporation providing housing for the elderly. The property in question consists of 30.45 acres and significant improvements located in West Salem. The improvements fall into three main categories. The first is a tower building (the Tower), which has a basement, nine floors, and penthouses. The Tower contains the kitchen, dining room, auditorium, offices, other common areas, and between 226 and 229 apartment units.[2] There are also 17 residential-care beds located in 10 rooms in the Tower. Originally constructed in 1961-62, the Tower is a reinforced concrete structure of approximately 180,312 square feet. The Tower apartments vary in size from 338 square feet for a studio to 778 square feet for a penthouse

---

[1] All references to the Oregon Revised Statues are to 1993.

[2] The number of units vary because the Manor has been enlarging some of them.

unit with a kitchen. The total area of the apartments comprises 107,296 square feet, leaving 73,016 square feet for common and other areas.

The second main improvement is the health care center, a two-story reinforced concrete structure in the shape of a cross, constructed in 1988. The second floor is used as a nursing home with 26 semi-private and 6 private rooms, with a total of 58 nursing beds. The first floor, which is a daylight basement, serves as a common area for the entire complex and includes a swimming pool, seven guest rooms, exercise room, general store, thrift store, ice cream parlor, bank, library, game rooms, TV lounge, chapel, laundry, and other facilities.

The third main improvement is the Villa complex; 22 buildings ranging from duplexes to five-plexes, totaling 83 residential living units. They are all one-level units with attached garages, varying from one to three bedrooms and are designed for independent living. In addition to the three main improvements, there are 77 carports, 22 garages, two attached locker rooms with showers, a separate 3,770 square foot recreation hall, parking lot, and other landscaping features.

The property is used as a continuum of care retirement center (CCRC). Once a person becomes a resident, the Manor will provide whatever level of care is needed until death. Thus, the facilities are designed to provide for independent living, assisted living, and full-nursing care. The Manor is a comprehensive, closed health-care system. No outside patients are allowed into its nursing-care facilities and there are no limits on the personal and nursing care provided. The Manor provides one or more meals daily for every level of care.

The residents pay for the services in two ways: an accommodation or entrance fee and a monthly maintenance fee. The accommodation fee is a lump-sum amount ranging from $24,850 to $59,050 for the Tower units and up to $93,355 for a Villa unit. This fee is refundable in part: if the person dies or leaves within 50 months, then they are refunded a prorated amount. No refunds are given after 50 months. It should be noted that for purposes of funding its

services, the Manor amortizes the fee over the life expectancy of the resident which, on average, is longer than 50 months. The monthly maintenance fee ranges from $919 to $2,083 per month. If a resident requires assisted living care or nursing care, then there are additional fees to be paid but they are less than market rates. Perhaps more important, the Manor has made provision that if a resident becomes unable to pay the full amount of the fees, then they are still a welcome member of the family and are not ejected.

The appraisers in this case agree that the accommodation fees and maintenance fees are used by the Manor in part to cover or subsidize the health care provided. Consequently, the residents may consider the accommodation fees to be a form of prepaid insurance. Testimony indicated that the assurance of lifetime care promised by the Manor is the primary reason given by individuals applying to become residents. No Medicare or Medicaid is received by the Manor, requiring management to carefully plan to assure that the fees cover all expenses.

## ISSUE

What is the real market value of the subject property *as determined under ORS 308.490*?

## APPLICABLE LAW

The appraisers in this case were faced with a very difficult appraisal assignment. In truth, ORS 308.490 is sufficiently different that it is appropriate to discuss it before considering the appraisal evidence.

■ The legislature has declared that:

"* * * *ordinary methods* of determining the real market value of real property * * * *are not appropriate* with respect to property of nonprofit homes for elderly persons, operated by corporations described in ORS 307.375." ORS 308.490(1). (Emphasis added.)

■ After making this declaration, the legislature directs that "the county assessor shall not take into account considerations of replacement cost, but shall consider:

"(a) The amount of money or money's worth for which the property may be exchanged within a reasonable period

of time under conditions in which both parties to the exchange are able, willing and reasonably well informed.

"(b)  The gross income that reasonably could be expected from the property if leased or rented to the public generally, less annual operating expenses, reserves for replacements and insurance, depreciation and taxes.

"(c)  The relative supply and demand for similar properties.

"(d)  The relative value of the location of the property."

While subparagraph (a) is phrased in terms which measure market value, subparagraph (b) is not. Subparagraph (b) varies from the "ordinary" methods of appraisal in two ways: (1) it requires the assessor to use a different gross income and (2) it requires the deduction of depreciation in addition to a deduction for reserves.

With regard to the measure of gross income, this court pointed out in *St. Catherine's Residence, Inc. v. Dept. of Rev.*, 14 OTR 500 (1998), that the phrase "leased or rented to the public generally" appears intended to distinguish between property used to house elderly people and property used to house the public generally.

The legislature undoubtedly recognized that housing for the elderly usually includes services that result in extraordinary "rental" prices. For example, a studio apartment of 400 square feet that might rent to the public generally for $400 per month could cost $800 to $900 per month as housing for the elderly. The difference in the amounts charged may be attributable to food services, housekeeping, assisted living or nursing care and other amenities provided the elderly. While deducting the costs of those services can remove that portion of the "rent" paid for those services, it clouds the issue of property value. If the services provided are "profitable" because the amount charged exceeds their cost, then an unadjusted income approach would attribute value to the property that is in fact business value created by services. On the other hand, if the services are "unprofitable" because their costs exceed the amount charged for them, then an unadjusted income approach will undervalue the property. Consequently, the legislature may have considered it

cleaner and fairer to simply value the property as general residential rental property. Such measures involve low levels of service, if any, making it easier to estimate the income attributable to the property. However, the statute's approach creates other problems.

■ A different rental standard assumes a different highest and best use of the property. Yet, the very nature of housing for the elderly is often different from housing rented to the public generally. For example, as is true with parts of the subject property, some units may have only an abbreviated kitchen or none at all. Often there is minimal closet or storage space, few parking spaces, or other limitations that the general rental public would consider deficiencies. On the other hand, elderly housing may have common dining rooms, nursing stations, libraries, recreation rooms, and other areas not found in housing provided to the public generally. Those differences make it extremely difficult for an appraiser to estimate what the property could rent for if rented to the public generally.

Those differences also make it difficult to estimate the "annual operating expenses" that are to be deducted from the estimates of gross rental income. In standard appraisal terminology:

> "* * * Operating expenses are the periodic expenditures necessary to maintain the real property and continue the production of the effective gross income." Appraisal Institute, *The Appraisal of Real Estate* 490 (11th ed 1996). (Emphasis in original.)

The legislature has directed that the gross income be measured by what the property could be rented for if rented to the public generally. Therefore, the operating expenses should be those necessary to maintain the property if it were rented to the public generally. Expenditures that are unique to housing for the elderly, such as housekeeping or assisted living care, should be eliminated from the calculations.

■ ORS 308.490(2)(b) also varies from ordinary methods of appraisal by requiring a deduction for "reserves for replacements" as well as "depreciation." A deduction for depreciation is odd because ORS 308.490 is limited by its

terms to nonprofit corporations. Depreciation is a concept usually employed only by for-profit corporations. Also, there is the question of what the legislature intended or meant by "depreciation." In another case, this court concluded that:

> "* * * the legislature must have meant accounting or book depreciation. It could not have intended depreciation in the appraisal sense because the loss in value due to physical condition, functional obsolescence and external obsolescence could exceed a property's total annual income. In that case, the approach would indicate a zero or negative value, an absurd result not intended by the legislature." *Gangle v. Dept. of Rev.*, 13 OTR 343, 347 (1995).

By deducting reserves for replacements in addition to depreciation, the resulting net operating income will be less than the property actually could earn. When it is capitalized at a market rate, the resulting indicated value will be less than the amount the market would pay for the property.

■ Those legislatively mandated departures from "ordinary" methods of appraisal are departures from reality. Consequently, ORS 308.490 presents an assessor with a judgmental quandary. The assessor is directed to consider two different approaches to property, the sales comparison approach and the income approach. Used as directed, these two methods will produce divergent indications of value. The sales comparison approach considers sales of other properties used as housing for the elderly. Those sales will tend to reflect a "high-end" value because they will have a higher and better use and a greater income than property rented to the public generally. In contrast, the modified-income approach will indicate a value towards the "low end" because it assumes less income and more deductions.

■ Faced with this predicament, how is the assessor to determine which indicator of value should be given the greatest weight? In the reconciliation process, an appraiser looks to the reliability of the market data underlying each method, the fit or appropriateness of each method in relationship to the purpose of the appraisal, the degree of subjectivity in each method, the number and size of adjustments made, and, in sum, the appraiser's confidence in each approach.

However, in some instances under ORS 308.490, these considerations may not be adequate. If that happens, then the appraiser may need to consider the purpose of ORS 308.490. The legislature has declared that "ordinary" methods are "not appropriate" for valuing nonprofit housing for the elderly. If the "ordinary" method indicates a higher value, it would seem that greater weight should be given to the method that is not an ordinary method. All other things being equal, the modified income approach should be given greater weight than the ordinary sales comparison approach.

## THE EVIDENCE

The county's appraiser, James Brown, has extensive experience in appraising retirement and nursing home properties. He testified that due to the limited market, he had to go outside the area to find comparable sales. He analyzed the comparable sales by two units of comparison: price per square foot and price per unit or bed. In making the comparisons, he included common areas and other building areas in the calculations in order to compare total facilities.

He found that the subject property averaged 868 square feet per unit or bed and adjusted the comparable sales for size on that basis. Although he found 13 sales (average unit price of $73,903), he excluded seven sales from either end of the continuum. The remaining six sales had an average price of $65,699 per unit, which he rounded to $65,000 per unit. Brown acknowledged that there were additional adjustments to be considered such as quality, location, age, size, and amenities, but he found no comparable data on which to base such adjustments. He did consider the subject as superior in quality and amenities, which he believed should offset any downward adjustment for size. He declined to make any adjustments based upon subjective judgments. Therefore, his per unit of comparison of $65,000, multiplied by 327, his total number of units, indicated a value of $21,255,000.

He used the same approach for the nursing home facilities, which were treated as a different category. Based upon five nursing home sales, he found an average unadjusted price of $48,666 per bed. After considering the subject property's superior qualities and amenities, he estimated a

price per bed of $50,000. Multiplying 58 nursing beds by $50,000 gave him an indicated value of $2,900,000. Adding that amount to the indicated amount for the retirement facilities of $21,255,000 gave him a total indicated value on a per unit/bed basis of $24,455,000.

Brown also compared the comparable sales on the basis of their price per square foot. That comparison gave him an indicated range of $55.29 to $173.13 per square foot for the retirement facilities. After analyzing the data, he selected $75 per square foot. Multiplying 283,692 square feet for the retirement area by $75 gave him an indicated value of $21,276,900. Using the same approach with the nursing home facilities, based on five comparable sales, he found a range of $77.32 to $175.26 per square foot. Multiplying his estimated $100 per square foot by the nursing home facility's 29,500 square feet gave him an indicated value of $2,950,000. Thus, his per square foot comparison gave him a total indicated value of $24,226,900.

However, Brown recognized that the comparable sales were for-profit facilities. To adjust for that, he made an estimated deduction for "going concern value" of 15 percent on the retirement facilities and 25 percent on the nursing home facilities. That deduction left him with a total indicated real market value by the sales comparison approach of $20,275,000 (rounded).

In applying the income approach, Brown knew that the accommodation fees were amortized over the life expectancy of the residents. Based on data provided by the Manor, he determined a "blended" life expectancy (males and females) of 13.8 years or 165.6 months. After considering "rent" levels of other elderly housing facilities, he concluded that the subject's maintenance fees and accommodation fees represented market rent for the subject property. However, he estimated a greater gross income than actually realized by the Manor. That resulted in large part from his assumption that the unamortized accommodation fees should earn interest at 9 percent. His estimates gave him a total gross income of $7,400,000. Deducting the Manor's actual operating expenses for 1994-95 of $5,164,678 left him with an estimated net operating income of $2,235,322. Dividing this by a

direct overall capitalization rate (including property taxes) of 12.99288 percent gave him an indicated value of $17,200,000 (rounded).

Brown's capitalization rate was derived from the same 13 retirement sales and five nursing home sales used in his sales comparison approach. Based upon the range provided by each of those groupings and their relative proportions, he estimated a capitalization rate of 11 percent. Added to that was 1.99288 percent for property taxes.

In reconciling the values indicated by the sales comparison approach and the income approach, Brown found that an average of the two indicators was $18,737,500. He then estimated the real market value for the subject property at $19,000,000.

The Manor's appraisal witness was Patrick Jordan, who also has extensive experience in appraising retirement and nursing home properties. Jordan used seven comparable sales, four of which were the same as Brown's. Jordan did not believe the market considers sales on a per square-foot basis. He concluded that price per unit is the most common basis for comparing sales of retirement and nursing home properties. Jordan indicated that an Effective Gross Income Multiplier (EGIM) is also used by the market for comparison. This apparently led him to use his estimates of net operating income per unit to adjust the comparable sales on a per unit basis.

As did Brown, Jordan recognized there was a difference between retirement facilities and nursing home facilities and therefore addressed each of those components separately. After making adjustments and then blending the retirement and nursing home indicators, Jordan found an indicated value of $17,650,000 by using the sales comparison approach. He also calculated a sales comparison value of $11,520,000 by deducting "depreciation."

Jordan also considered the rates of other retirement and nursing home facilities to determine reasonable rates for the subject property. Like Brown, he concluded that the facility's current rates were at or above market rates. However, in amortizing the accommodation fee, he used a life expectancy

of 9.6 years or 115 months without imputing any interest to the unamortized balance. Also, based on his comparable sales, he selected a 12 percent direct capitalization rate which, after adding the tax rate of 1.99288 percent, gave him an overall rate of 13.99288 percent. Dividing his estimated net operating income of $1,962,680 by 13.99288 percent gave an indicated value of $14,026,276. However, that was without deducting the depreciation as specified by ORS 308.490. When depreciation is deducted, the modified income approach gives an indicated value of $9,150,000 (rounded).

In the reconciliation process, Jordan concluded that the sales comparison approach gave only a "rough estimate" of the value of the property. Accordingly, he gave it no weight and relied upon the income approach. Therefore, his opinion of value for the subject property as of July 1, 1994, was $9,150,000.

## ANALYSIS

The appraisers agree on significant points. Both agree that the highest and best use of the property is as a CCRC. That is appropriate for the sales comparison approach, but not for the modified income approach under ORS 308.490. Although there were some differences with regard to the accommodation fee and how to treat it, generally both appraisers agree that the fees charged by the Manor are at or above market rates. Consequently, both appraisers purported to use the Manor's income and expenses. The court sees two problems with this in the income approach.

First, it is not consistent with the direction of ORS 308.490(2)(b) that estimated gross income be based on what could be expected if the property was rented to the public generally. As indicated above, there can be significant differences between the gross income of a property used to house the elderly and the gross income of the same property if it is rented to the public generally. The fact that both appraisers ignored this important statutory direction undercuts the weight of their respective opinions.

Second, both appraisers acknowledge that the Manor is unusual, if not unique, in that it offers life care, using the accommodation fees to subsidize the health care

services. None of the comparable properties considered by either appraiser offered the same level of services. An appraiser must identify the differences in cost due to the different levels of service to know whether the subject's rates are below, above, or at market. Even then, many of those expenses relate to the operation of a business rather than the operation of the property.

Both appraisers agree that the accommodation fee should be treated as prepaid rent and amortized over the life expectancy of the resident. They do not agree on the period of time to use nor do they agree on the amount of interest to be imputed, if any.

In considering the sales comparison approaches, the court finds that neither is very persuasive. Jordan recognized this and gave no weight to his sales comparison indication of value. However, even if he had given it some weight, the court finds it unpersuasive because he used net operating income as a basis for adjusting the sales. In the context of property where significant services are rendered and the appraisers are comparing for-profit facilities with nonprofit facilities, this approach results in a less-than-persuasive indication of value. Also, Jordan deducted "depreciation" in the sales comparison approach. ORS 308.490 provides for deducting depreciation only in the modified income approach.

Brown's analysis of comparable sales has fewer specific weaknesses but also leaves much to be desired. He declined to make direct adjustments to comparable sales for age, quality, location, occupancy, licensing, amenities or the cost of operation because he did not want to make subjective adjustments. However, he did adjust the indicated values down 15 and 25 percent for "going concern value" without any data to support such an adjustment. Also, there were no comparable sales of large type A facilities. In addition, as expressed by Jordan:

> "* * * the industry is typified by transactions equating to the 'going concern' value of the enterprise rather than strictly the real estate involved in the sale.

"The value of the going concern of a project is enhanced by the possession, if required, of a state license."

If an appraiser uses the sales comparison approach under ORS 308.490, then adjustments must be made in order to arrive at a value for property as opposed to arriving at a value for a going business.

As indicated, the appraisers had many points of agreement in the income approach. Despite that, their points of disagreement resulted in a difference in estimated gross income of $1,113,845 and a difference in net operating income of $954,682. That was due in part to Brown's perspective that the contract for life care constitutes a leasehold or a form of life estate. He believes that the current income earned by the Manor does not reflect all of its value because some of it is based on an older fee schedule. Consequently, he views some of the arrangements with the older residents as being similar to an uneconomic lease which would not reflect full taxable value of the property. As indicated by the Oregon Supreme Court, for purposes of property taxation, the appraiser must use market rent to measure market value. *See Swan Lake Mldg. Co. v. Dept. of Rev.*, 257 Or 622, 478 P2d 393, 480 P2d 713 (1971).

One of the problems with Brown's approach is that he assumes that "old" accommodation fees are out-of-date. There was no evidence to support this assumption. Accommodation fees paid by a resident five years ago may be less than the current amount, but the resident who paid that fee may also have five years less to live. If the accommodation fee is viewed as a form of premium for health insurance, then market data is needed to show how the amount charged is related to the risk involved. There is no persuasive evidence that the current income, including past accommodation fees, is not reflective of current "rent."

The appraisers agree that the subject property is unique due to its (1) size and (2) providing a continuum of care. The size of the facility is a major factor. Brown indicated that generally, the price per square foot increases as the building area per unit decreases. Similarly, Jordan's rent

comparables show that the rent per square foot increases as the area per unit decreases.[3]

The appraisers differ in the capitalization rate used. Jordan found that his comparable sales indicated a range of approximately 10 to 12 percent for retirement facilities and 11 to 19 percent for nursing homes, while Brown's sales indicated a range of 10 to 12 percent for retirement facilities and 9 to 15 percent for nursing homes. The lower the capitalization rate, the lower the estimated risk. Brown recognized that nursing homes "typically have a higher direct capitalization rate than a retirement center." It is logical that nursing homes have a higher risk associated with their operation than retirement centers. Inasmuch as the Manor offers continuum life care, it should have a higher capitalization rate than properties offering lesser levels of care. That suggests that, from the alternatives presented by the evidence, 13.99288 percent would be a more appropriate overall direct capitalization rate.

In summary, the court is faced with reconciling Jordan's $9,150,000, arrived at by the modified income approach, with Brown's $20,275,000, arrived at by the sales comparison approach. This range is wide and suggests that the difference arises from the use of the two disparate approaches rather than differences in market data.

On the whole, the court finds that the sales comparison approach, using sales of for-profit facilities, is not entitled to much weight under ORS 308.490. Those sales are more inclined to capture the value of an operating business than the income approach.[4] Also, as discussed above, ORS 308.490 indicates that "ordinary methods" are "not appropriate" for determining the value of nonprofit homes for the elderly. This suggests that the legislature may be seeking to reflect the risks of nonprofit homes for the elderly and give them the benefit of the doubt when it comes to property taxation.

---

[3] It is not clear whether Jordan considered amenities and common areas in making this analysis.

[4] Although retirement properties may sell as an operating business, Oregon's property tax statutes assess only the value of the tangible property.

The court finds that the income approach produces a more accurate indication of the value sought by the legislature and therefore should be given greater weight. Accordingly, the court finds the following real market values as determined under ORS 308.490 for the subject property are as follows:

> July 1, 1993 - $9,465,000
> July 1, 1994 - $9,530,000
> July 1, 1995 - $9,115,000

Inasmuch as the court's finding and analysis is consistent with the determinations made by the Department of Revenue in its Opinion and Order Nos. 93-3207(M), 94-0946(M), 96-0432(M), and 96-1559(M), such orders are hereby sustained and judgment will be entered establishing the same values on the tax rolls. Intervenor to recover its costs and disbursements.