LINUS OAKES, INC.,
an Oregon nonprofit corporation,
fka Parkway Medical Buildings, Inc.,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant,*
*and*
DOUGLAS COUNTY ASSESSOR,
*Intervenor-Defendant.*

(TC 4234)

Trial was held May 22, 23, and 24, 2000, in the courtroom of the Oregon Tax Court, Salem.

Marc K. Sellers, Schwabe, Williamson & Wyatt, Portland, argued the cause for Plaintiff (taxpayer).

James C. Wallace, Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant (the department).

Paul E. Meyer, Assistant County Counsel, Douglas County, Roseburg, argued the cause for Intervenor-Defendant (the county).

Decision for Defendant and Intervenor-Defendant rendered July 20, 2000.

## CARL N. BYERS, Judge.

Plaintiff (taxpayer) appeals from an opinion and order of Defendant Department of Revenue (the department) setting the assessed value of taxpayer's real property for the 1995-96 tax year. Douglas County Assessor (the county) intervened and filed a motion for partial summary judgment to resolve a dispute as to whether taxpayer qualified for special assessment under ORS 307.375 through ORS 307.490.[1] After considering the motions and arguments of the parties, the court issued its order on November 4, 1998, holding that taxpayer did not qualify for special assessment as of July 1, 1995. *See Linus Oakes, Inc. v. Dept. of Rev.* 14 OTR 412 (1998). Thereafter, the parties had the property appraised to determine its real market value, and evidence of value was submitted at trial.

## FACTS

The subject property is operated as a continuing care retirement center (CCRC) in Roseburg. It is situated on 16.34 acres adjacent to Mercy Hospital.[2] The improvements consist of two main buildings or lodges and 15 separate smaller buildings called cottages. The cottages vary in size from 16 units to duplexes. As of the assessment date in question, 105 of the total 123 units were completed; 10 were 60 percent complete and 8 were 10 percent complete.

The main buildings contain large common areas as well as living units. The common areas consist of the main dining area, social and recreational rooms, exercise rooms, activities and sitting rooms, beauty and barber shop, bank, library, post office, chapel, and storage areas. The main buildings also contain administrative offices.

Elderly housing facilities can provide varying levels of service, ranging from almost no services (*i.e.*, simply a retirement community setting) to acute nursing care. The

---

[1] All references to the Oregon Revised Statutes are to 1993.

[2] Two and 93 hundredths acres were added to the site after the assessment date in question.

subject facilities were designed for "independent living," which entails a relatively low level of services. Taxpayer provides its residents with one meal per day, one hour of housekeeping per week, bed and bath linen service, maintenance of the unit (both interior and exterior), transportation for activities and medical needs, and a resident nurse who mainly serves as an educational resource to the residents. Taxpayer also sponsors activities, seminars, classes, and outings.

At the highest service level, a CCRC provides care for its residents until their death, which normally requires nursing facilities on-site. Taxpayer has elected to be at the lowest end of the CCRC level of service scale. Taxpayer's residents are entitled to remain in their units until death, but taxpayer provides no nursing care on-site. It does provide up to ten days of off-site nursing care per year for its residents. A resident chooses an off-site provider and taxpayer pays the bill.

Like many such facilities, taxpayer charges an entrance fee as well as a monthly maintenance fee. For example, as of July 1, 1995, to become a resident and live in the smallest one-bedroom unit, a resident would have had to pay an entrance fee of $40,900 and a monthly maintenance fee of $963 ($1,301 double occupancy). The cost of the largest unit as of the assessment date was $89,332 entrance fee and $1,767 monthly maintenance fee ($2,105 double occupancy). By agreement, if a resident leaves or dies, up to 75 percent of the entrance fee is refundable without interest. There are additional elective charges for such amenities as cable television, covered parking, tray service, and charges for guests who may use the facility's guest rooms and meals.

*Summary of Appraisal Evidence*

Taxpayer's appraiser, Donald Palmer, is experienced and knowledgeable with regard to retirement facilities. He applied only two of the three traditional approaches to value. He declined to use the cost approach because he concluded that the market does not use that approach when setting sale prices and the subject property suffered some functional obsolescence. Using the income approach, he concluded that taxpayer's actual charges and expenses were representative of the market. Based on his analysis, he found

an effective gross income of $1,768,198 from which he deducted expenses of $1,364,607 to find a net-operating income of $403,591. Inasmuch as the expenses did not include property taxes, he added 1.5 percent for property taxes to a direct capitalization rate of 11 percent. Dividing $403,591 of net income by 12.5 percent gave him an indicated value of $3,228,730 ($3.2 million rounded).

Using the direct sales-comparison approach, Palmer used five sales that ranged from $52,519 to $89,888 per unit. After considering the differences in levels of care, design, and other factors, he selected $50,000 to $55,000 per unit as the most probable value for the subject property. That gave him an indicated range of value by the sales comparison approach of $5,550,000 to $6,105,000. Palmer viewed the sales comparison approach as unreliable and placed no weight upon it.

The department's appraiser, James Brown, is also very experienced and knowledgeable in appraising elderly housing facilities. He utilized all three approaches to value. In applying the cost approach, he used the segregated component method, estimating the amount and quality of the improvement components, determining their cost, and then deducting any depreciation. Brown utilized Marshall Valuation Services for his cost data, which is a national firm that provides cost information to appraisers for a fee. Based on his estimates and the costs obtained, he found an indicated cost of $11,128,000 new. Brown analyzed bare land sales and determined that the value of the land was $710,000. He deducted physical depreciation based upon his judgment that the completed improvements had an effective blended age of eight years. A deduction was also made for improvements that were not complete as of the assessment date. After those deductions, Brown had an indicated value by the cost approach of $9,360,000.

Applying the direct sales comparison approach, Brown used four sales, one in Oregon and three in California. Based on the price per unit, he found that the sales gave a range of $61,129 to $88,764 per unit. Determining that the average units in the sales were smaller than the subject, he adjusted the sales 28 percent for size, which gave him a range of $80,000 to $88,764 per unit. Selecting $85,000 as the best

indicator and multiplying by 123 units gave him a gross value of $10,455,000. He then deducted for the incomplete units and personal property to find an indicated value by the sales comparison approach of $9,320,064 ($9,320,000 rounded).

In the income approach, Brown also used the actual rents charged by taxpayer. However, he included imputed earnings on the refundable portion of the entrance fee as additional rent. He calculated entrance fee income by attributing a 9 percent return on the total amount of entrance fees for ten years, at which time 75 percent would be refunded. He then discounted the earnings and the retained portion of the entrance fees back to a present value and then amortized that present value forward over ten years at 9 percent. The net result is to increase the income of the subject facility by $776,616 per year. That approach resulted in an effective gross income of $2,500,000 (rounded). Brown used eight rent comparables to estimate expenses of $1,335,000 (rounded), leaving him with a net operating income of $1,165,000. When that amount is divided by a direct capitalization rate of 11 percent, it results in an indicated value of $10,590,909. From this amount, Brown deducted for the incomplete units and personal property, leaving him with an indicated value of $9,450,000 by the income approach. In his reconciliation, Brown relied primarily on the cost approach and determined that the real market value of the subject property was $9,800,000.

## ANALYSIS

As property that does not qualify for special assessment under ORS 308.490, the subject must be assessed at its real market value. Therefore, the court must determine the lowest amount for which the property would have exchanged hands between a willing buyer and a willing seller during the period of July 1, 1995 to June 30, 1996. ORS 308.205.

As is often the case, there are many areas of agreement between the two appraisers. Here, they agree that the highest and best use of the property is as a retirement facility. They agree that the quality of the improvements is average to good or average plus. They agree that the management is excellent, and they agree that there is a strong market

demand for elderly facilities. They also agree that if the property were put on the market, it would sell within one year or less; however, there are few market sales and such properties are not usually listed on the open market. As will be seen below, those points of agreement are important.

*Cost Approach*

The fact that there is market demand for elderly facilities and few sales suggest that such properties should be able to obtain a good return on investment. Palmer disagrees. Palmer concluded that cost is not a good indication of value because the costs were "outrageous" when compared to rents obtainable. However, the court finds that the evidence is to the contrary. In fact, as of the assessment date, taxpayer was in the process of adding an additional 30,000 square feet to its facilities because of market demand. Also, a new competing facility was built in Roseburg two-to-three years after the assessment date. Investors choosing to construct new facilities rather than purchase existing properties is evidence that investors can and do obtain a market rate of return on new construction.

Palmer also rejected the cost approach because of perceived functional obsolescence. However, he appears to have confused the value concepts applied under ORS 308.490 (special assessment) and those applied under ORS 308.205. If property qualifies for special assessment under ORS 308.490, that statute requires the income approach to consider how much gross income the property could receive if "leased or rented to the public generally." Under that test, the common areas in the subject property would probably be too large and therefore include some functional obsolescence. However, the property does not qualify for special assessment and must be valued at its real market value. The appraisers agree that the property's highest and best use for market value purposes is as a CCRC. When used as a CCRC, the common areas are not too large and are not a source of any functional obsolescence. Therefore, Palmer's rejection of the cost approach in part because of functional obsolescence due to the common areas is an error and weakens his opinion.

As Brown testified, the cost approach gives the best indication of value in this situation. Here, the objective is to

value tangible real property, not going-concern or business value. A CCRC is a going concern that provides many services for which income is received. Consequently, there is some danger of overvaluing or undervaluing the real property due to inability to separate income for services from income for use of the property. In the income approach, a typical method is to deduct the expenses of providing the services. However, if the operator is charging too little for the services, the income approach will undervalue the property. If the operator is charging too much for its services, the income approach will overvalue the property. The cost approach eliminates this danger by avoiding any going-concern value or value attributable to services. It also eliminates the effects of management and management policies that affect the income earned by the property. Where the property is reasonably new construction, the cost approach can provide a good indication of a base value.

Palmer rejected the cost approach because he concluded that the market does not use that approach in determining the sale prices of existing properties. The court finds that conclusion too shallow and not supported by the evidence. Certainly the market must weigh the cost of construction against the cost of purchasing an existing property. Every new facility constructed constitutes evidence that a "buyer" considered the cost approach and decided to incur the cost instead of purchasing an existing property. Moreover, in some areas or locations there may be no existing property to be purchased.

*Income Approach*

As mentioned, the court has several concerns with the income approach. In addition to those concerns, the court must resolve a dispute between the appraisers as to the appropriate treatment of entrance fees.

Taxpayer's accountants apparently advised it that only the nonrefundable portion of the entrance fees should be included in income. Taxpayer amortizes that portion over the average ten-year period of a resident's stay. Such accounting ignores the refundable portion and the value of its use for that ten-year period. Palmer concluded that taxpayer's approach is appropriate and followed it with regard to the

treatment of entrance fees. However, he did not follow tax-payer's accounting procedures with regard to replacements. He created his own estimate of reserve for replacements.[3]

In perspective, the court has little confidence in Palmer's income approach. In addition to the year in issue, his appraisal report contains an income approach for July 1, 1996, the following tax year. That indicated value (excluding furniture, fixtures, and equipment) is $4,978,079 or $2,244,871 higher than his 1995 value of $2,733,208, an 82 percent increase from one tax year to the next.

Palmer also performed an earlier appraisal for the subject property for the 1995 year in which he concluded that the real market value of the property was $4,480,000. In that appraisal he included investment earnings. In the present case he testified that including investment earnings was wrong and when he did his second appraisal, he excluded them. He testified that investment earnings were the main difference between the two appraisals. However, investment earnings are not the main difference. Palmer's estimated income in his appraisal here was only $9,310 lower than his previous appraisal. In contrast, his estimated expenses here are $159,227 higher than in his previous appraisal. With such great variations, the court has little confidence in those indicated values.

■ Brown's method of calculating income from the entrance fees is novel, but does not appear to be unsound. It assumes that entrance fees must be kept on hand as quasi-trust funds, but the property owner is entitled to the earnings therefrom. Certainly any owner would consider the value of the use of such funds during the resident's tenancy. Inasmuch as property value is based upon all anticipated cash flows and potential appreciation, any measure should capture all the benefits. There is no question that use of the entrance fees is part of the flow of benefits.

The evidence in this case indicates that there are two possible approaches. One approach is simply to include the entrance fees at their full face amount when received.

---

[3] The court questions whether mixing book accounting and cash flow analysis is appropriate.

Under that approach, a discounted cash flow analysis could be used to indicate the value of the property. However, that approach would ignore the contractual obligations of the property owner to the residents. A second approach, used here, recognizes the owner's contractual obligations to repay part of the entrance fees. However, it also recognizes the benefits of being able to use the entrance fees until the refundable portions have to be returned. That approach is used in an authoritative text introduced into evidence. The analysis there sets aside a reserve for repayment but also includes income from the reserve fund investment.

Under either method, the appraiser is measuring cash flows to obtain some indication of the present market value of the property. The court finds that it can give little weight to Palmer's income approach because it attributes no value to the use of the refundable portion of entrance fees. Inasmuch as the potential entrance fees as of the assessment date were $7,370,753, the court finds that his income approach omits a significant portion of the benefits attributable to the property.

The court is not entirely comfortable with Brown's income approach. He attributes a 9 percent return to the funds held by taxpayer. Brown testified that he estimated that rate based on general mortgage rates; understanding that many developers use entrance fees to pay down their mortgages. However, the evidence indicated that taxpayer actually obtains only a 4 percent return on its money. Neither side introduced evidence as to market rates with regard to different types of investments. The court acknowledges that with both appraisers agreeing upon an 11 percent direct capitalization rate, the court cannot reject the 9 percent outright, but feels it is on the high side.

Another way of looking at Brown's result is to recognize that his $776,616 of income attributed to entrance fees is slightly more than 10 percent of the total entrance fees. Thus, Brown's approach assumes that the owner would receive those fees spread over the average ten-year stay of the residents. The primary problem with that approach is that it gives no credit for fees that are actually refunded and it assumes that the fees will be received in perpetuity.

In view of all of the weaknesses of the income approach, including potential confusion with going-concern value, the court will give it limited weight.

*Sales Comparison Approach*

The appraisers agree that while an aging population has created a demand for retirement facilities, there is no open market in which such properties regularly change hands. Some of the evidence suggests that retirement facilities typically do not sell or transfer unless they are experiencing financial trouble. The absence of open sales, the presence of some business value, and the many levels of service all tend to make the sales comparison approach a weak indicator of the real market value of the real property. That is reflected in both appraisers' judgments, since Palmer gave the sales approach no weight and Brown viewed it as only a rough-value estimate.

The court finds that variations in unit sizes and common areas make a comparison based on price per unit unreliable. Palmer made the comparison without adjusting for size while Brown made the comparison adjusting 28 percent for size. The court finds that a better measure for comparison would be the price per square foot. That unit of comparison captures common areas as well as accounting for units of varying size. Brown's comparable sales ranged from $66.92 to $74.39 per square foot with an average of $72.59 per square foot. Palmer's sales ranged from $54.49 to $117.14 per square foot with an average of $78.36. If Palmer's high and low sales are eliminated, his average is $73.41 per square foot. The court finds that Brown's $72.50 per square foot is reasonable. That measure would indicate a value of $10,150,000. After deducting for personal property and uncompleted units as of the assessment date, that measure indicates a value of $9,000,000 (rounded).

Based upon the above analysis, the court is in agreement with Brown except with regard to the weight to be given to the indications of value. For the reasons given, the court reconciles the various indications of value as follows:

Cost Approach          $9,800,000  x   40%  =  $3,920,000

Sales Approach         $9,000,000  x   30%  =  $2,700,000

Income Approach        $9,450,000  x   30%  =  $2,835,000

Total Indicated Real Market Value                $9,455,000

Based upon the above, the court finds that the real market value of the subject property as of July 1, 1995, was $9,455,000. Costs to neither party.