HOPE VILLAGE, INC.,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 4602)

Andrew K. Kauffman, Canby, filed the Cross-Motion for Preliminary Ruling for Plaintiff (taxpayer).

Douglas M. Adair, Assistant Attorney General, Department of Justice, Salem, filed the Motion for Preliminary Ruling for Defendant (the department).

Preliminary Ruling rendered May 28, 2004.

**HENRY C. BREITHAUPT, Judge.**

## I. INTRODUCTION

In this property tax case both parties have requested that the court issue preliminary rulings on several questions to assist them in preparing for trial.[1] Each question relates to the construction of ORS 308.490,[2] a statute that both parties agree dictates the method of valuation for the property in question, a nonprofit home for the elderly. ORS 308.490 provides:

"(1) The Legislative Assembly finds that ordinary methods of determining the assessed value of real property, particularly by consideration of the cost of replacing a structure with a similar and comparable one of equivalent utility, are not appropriate with respect to property of nonprofit homes for elderly persons, operated by corporations described in ORS 307.375. The Legislative Assembly declares that the benefits inherent in operation of these homes, especially in the housing and care furnished to elderly persons for whom this state and its political subdivisions otherwise might be responsible, justifies the use of criteria set out in subsection (2) of this section.

"(2) In determining the assessed value of the property of a nonprofit home for elderly persons, operated by a corporation described in ORS 307.375, the county assessor

---

[1] This process has been used before. *See Boise Cascade Corp. v. Dept. of Rev.*, 12 OTR 263, 264 (1992).

[2] All references to the Oregon Revised Statutes (ORS) are to 2001.

shall not take into account considerations of replacement cost, but shall consider:

"(a) The amount of money or money's worth for which the property may be exchanged within a reasonable period of time under conditions in which both parties to the exchange are able, willing and reasonably well informed.

"(b) The gross income that reasonably could be expected from the property if leased or rented to the public generally, less annual operating expenses, reserves for replacements and insurance, depreciation and taxes.

"(c) The relative supply and demand for similar properties.

"(d) The relative value of the location of the property."

## II. PRELIMINARY RULINGS REQUESTED

Plaintiff (taxpayer) and the Department of Revenue (the department) have requested preliminary rulings on the following issues:

### A. *The Sales Comparison Approach*

Taxpayer requests a preliminary ruling that the assessor may consider an ordinary sales comparison approach under ORS 308.490(2)(a) and a modified income approach under ORS 308.490(2)(b), both approaches to be informed by the considerations listed in ORS 308.490(2)(c) and (d). In contrast, the department views the provisions of ORS 308.490(2)(a) as stating an overall market value goal rather than a description of a sales comparison approach. The department further contends that in analyzing comparable sales it can, with proper adjustments, consider sales of apartments or condominiums.

### B. *The Modified Income Approach*

Regarding the application of the modified income approach set out in ORS 308.490(2)(b), taxpayer requests a ruling that the assessor should apply the statutory formula by determining the gross income that could be expected if the property were leased or rented to the public generally, less the expenses listed in the statute, each of which is a mandatory deduction, and dividing the resulting net operating income by a market capitalization rate. Conversely, the

department believes that statutory provision calls for "consideration of a pro forma income approach designed to estimate market value of the subject nonprofit retirement home if it was operated on a for profit basis."

## C. *Reconciliation of Value Indicators*

Taxpayer asks for a ruling that, in reconciling divergent indicators of value, the assessor should adopt the modified income approach when its indicated valuation is lower than the valuation indicated by the market exchange approach. The department argues that indicators should be reconciled to the overall goal of arriving at market value.

## III. INITIAL ANALYSIS

The court will proceed with the particular issues identified in the briefs of the parties. However, at the outset, it is important to address whether ORS 308.490 is a statute implementing special assessment principles. The foundation argument of the department on which most, if not all, of its particular points are based is that the goal of the procedures outlined in ORS 308.490 is to arrive at real market value. The department asserts that the 1969 legislation that produced ORS 308.490 was only a response to a finding that the practices then used in the valuation of nonprofit homes for the elderly produced assessments in excess of fair market value. The department argues that the statute did not, however, abandon a goal of fair market value (now referred to statutorily as real market value) and, specifically, did not authorize a special assessment process for retirement homes owned by nonprofit corporations.

■ Analysis of that point involves the methodology spelled out in *PGE v. Bureau of Labor and Industries,* 317 Or 606, 859 P2d 1143 (1993). The court has considered both the text and the context of the statute and reviewed the legislative history from 1969. This is necessary because the statute is far from clear on a number of points. That said, the legislative history presents a special problem because the finalized version of the statute was drafted anew in conference committee and adopted within a very short time period, without hearings. The conference solution was preceded by a

series of attempts to follow other approaches, each of which failed to command the necessary votes.

■ The legislative findings stated in ORS 308.490(1) reflect the legislative history of the discussions and legislative activity that occurred prior to the conference committee action. That legislative history shows legislators were concerned that, with few actual sales of retirement homes for use in a sales indicator and no "profit" on which to base an income indicator, the assessors were placing undue, if not sole, reliance on replacement cost as the indicator of value.[3] A number of legislators were concerned that value conclusions for retirement homes were in excess of values for similar "private" housing. Proposals to have statutorily objective and fixed percentage reductions to otherwise determined assessed values for retirement homes were defeated.

■ When the 1969 Legislative Assembly met, the base for determining property tax was "true cash value," which was, in substance, fair market value as of the assessment date. True cash value was to be determined by methods and procedures in accordance with rules and regulations of the department's predecessor. ORS 308.205, as amended by Or Laws 1955, ch 691, § 1. As of 1969, the use of cost, market, and income indicators to estimate market value was well established. *See generally Rogue Valley Manor v. Tax Comm.*, 244 Or 571, 419 P2d 422 (1966).

■ Given this background and context, the court does not believe that all the legislature sought in 1969 was cancellation of use of the replacement cost as an indicator of value. If that was all that was intended, the project could have been accomplished without the need for much of the language adopted by the 1969 legislature. The legislature could simply have directed that the replacement cost indicator not be considered. Instead, the legislature identified in detail what an assessor *must* consider. The court cannot conclude that the legislature was merely restating the fair market value standard of ORS 308.205.

---

[3] The court notes that it does not necessarily accept the view that an income indicator requires that the owner be a for-profit entity.

The department's position is that the processes specified in ORS 308.490, when followed, will produce the real market value of the property as the base for taxation, but avoid overvaluation. The department asserts that the product of the ORS 308.490 exercise is not a special assessment value. Prior to 1997, this might have been logically possible because in those years the base for property taxation was real market value, the very term used in ORS 308.490.[4] However, 1997 amendments to ORS 308.490, implementing Measure 50, specifically replaced the words "real market value" with the words "assessed value" in describing the end product or goal of the statutory process under ORS 308.490. Or Laws 1997, ch 541, § 202. Even if the position of the department had some appeal before the 1997 amendments to ORS 308.490, it is inconsistent with the constitutional amendments that occurred with Measure 50. Prior to 1997 it was unclear whether the use of the phrase "real market value" in ORS 308.490 referred to a concept of value or was another way of saying "the base for taxation." That ambiguity was clarified in 1997 when, pursuant to the constitutional amendments of Measure 50, Oregon moved from an *ad valorem* tax base to a computed tax base in which current property value was only one, and perhaps not the most important, component in the computation of the base for property taxation. Since 1997, the base for taxation has been referred to as "assessed value." *See* ORS 308.146.

If the department is correct, the assessed value (the amount to be determined under ORS 308.490) would be real market value and nonprofit homes for the elderly would always be assessed at real market value. Under that interpretation, such properties would never receive the benefits of Measure 50. The problem with such a construction is that nothing in Measure 50 indicates nonprofit homes for the elderly were to be excluded from its benefits. Quite to the contrary, Measure 50 purports to apply to "each unit of property in this state." Or Const, Art XI, § 11(1)(a).

---

[4] At earlier times, when the base for taxation had been "true cash value," ORS 308.490 had also used that term. *See* ORS 308.205 and ORS 308.490 (1993).

■ Alternatively, the 1997 changes in law, both to ORS 308.490 and generally under Measure 50, can operate without great difficulty if ORS 308.490 is treated as a special assessment statute that defines a method for determining the tax base for such properties, against which a tax rate is applied. This is possible because Article XI, subsection 11(2) provides a set of rules for application of Measure 50 to specially assessed properties.[5]

■ Finally, the department's view that no special assessment was intended for homes for the elderly is fundamentally inconsistent with the declaration in ORS 308.490(1) that:

> "[T]he benefits inherent in operation of these homes, especially in the housing and care furnished to elderly persons for whom this state and its political subdivisions otherwise might be responsible, justifies the use of criteria set out in subsection (2) of this section."

The above language cannot be squared with the view that nonprofit homes for the elderly were simply going to be taxed in the same fashion as all other properties. That statutory language expresses a *quid pro quo*, albeit speculative, of tax benefit in exchange for relief of potential burden on the government. The construction of ORS 308.490, that the valuation methods are not the general methods, has previously been articulated by the Oregon Supreme Court.[6]

In addition, the department's argument denying any special assessment or partial exemption feature for ORS 308.490 is inconsistent with the context in which ORS 308.490 is found. ORS 308.490 cross references to ORS 308.375 for a description of the types of corporations that can benefit from ORS 308.490. ORS 307.375 essentially describes

---

[5] Based on those constitutional rules, the legislature enacted statutory guidelines for application of Measure 50 to *some* specially assessed property, but not specifically for nonprofit homes for the elderly. *See* ORS 308A.107, ORS 308A.256. However, the legislature's failure to enact a statute addressing qualified elderly housing property does not prevent taxpayers from receiving the constitutional benefits of Measure 50.

[6] "It is clear that the legislature intended that such homes not be taxed as other property in general is taxed but, instead, be taxed under the special provisions of the 1969 Act." *Gangle v. Dept. of Rev.*, 320 Or 494, 498, 887 P2d 784 (1995) (discussing the property tax assessment of nonprofit housing for the elderly).

the classic features of a charitable entity, which cannot benefit private persons and whose assets on dissolution must go to entities that are exempt from property tax or to the State of Oregon. Oregon generally provides property tax benefits to charitable entities. The requirement that the entities owning nonprofit homes for the elderly have charitable features suggests strongly that they are to receive something in consideration for accepting the statutory restrictions.

 Further, the provisions of ORS 307.370 to 307.385 deal comprehensively with insuring that nonprofit homes for the elderly obtain and pass on the benefits of certain veterans' exemptions. If an operator of a home fails to pass the property tax savings on to the veteran, ORS 307.385 requires that the assessor "deny *it* any property tax *exemption* under ORS 307.370 to 307.385 *or 308.490* in the next assessment year, beginning January 1." ORS 307.385 (emphasis added).[7] In context, it is clear the legislature believed ORS 308.490 was some form of exemption.

For the foregoing reasons, the court does not accept the major premise of many of the department's arguments: that the goal of ORS 308.490 is to arrive at real market value rather than a special assessment. With this foundational matter resolved, the court will now address the particular points on which the parties seek rulings.

IV. APPLICATION OF THE SALES APPROACH
UNDER ORS 308.490(2)(a)

Taxpayer argues that ORS 308.490(2)(a) is a directive to employ a standard comparable sales approach to valuation of nonprofit homes for the elderly, but that the directive includes only nonprofit homes for the elderly.

 The department believes that because the legislative history of the statute contained some comparisons of the treatment of retirement properties to that for condominiums and apartments, a sales comparison approach must include consideration of such condominiums and apartment properties.[8] The court does not accept the department's argument.

---

[7] Oregon Laws 1969, chapter 587, section 6 stated that the assessor must deny the corporation "any property tax exemption under this 1969 Act." Section 8 of that very act was the provision codified as ORS 308.490.

[8] The department states in its opening memorandum: "If a nominal legislative goal was for retirement homes to be valued like other residential properties, it is

It is true that the legislative discussions preceding the adoption of ORS 308.490 included comparisons of the then-existing outcomes in assessment for elderly housing and other properties. But nothing in the material provided to the court suggests that anyone understood a comparison in historical outcomes to justify a requirement that general condominium and apartment properties be considered in evaluating retirement home properties. The department confuses a description of the problem with a requirement of a particular component in the solution. Indeed, the legislature appears to have understood that, at that time, there were few actual sales of elderly housing properties on which to rely. Given that knowledge, the court concludes that if the legislature had wanted to require assessors to consider general housing properties, it would have said so when it specifically addressed the weaknesses of the ordinary methods.

 The court views ORS 308.490(2)(a) as a directive to use, as part of the valuation process, a comparable sales indicator. This court has reached that conclusion before. *Polk County v. Dept. of Rev. (II),* 14 OTR 566, 572 (1999). If adequate sales of comparable elderly housing properties are available, the court assumes appraisers would place little reliance on dissimilar general housing properties. However, what in any given case constitutes a property comparable to an elderly housing property and what might be a "standard" or "regular" housing property that can be adjusted for comparability are matters for the court to consider in the context of the particular facts of a case and within the views of expert appraisers.

### V. ELEMENTS OF THE INCOME APPROACH UNDER ORS 308.490(2)(b)

A. *Gross Income*

 The parties are in general agreement that the statute requires consideration of the income that would be received if the property were rented to the public generally. The department, however, suggests that that amount of income can be estimated by looking at rental rates and other income sources

---

not unreasonable that sales of such properties be considered as part of the sales comparison approach." As indicated above, this court rejects the major premise of this syllogism (that the legislative goal was for retirement homes to be valued like all other properties), and therefore its conclusion.

of for-profit retirement facilities, including "buy-in" payments and earnings on such payments. It appears that the department reaches that conclusion based, again, on its major premise that the value computed under ORS 308.490 is to be market value. The fondness of the department for its major premise again leads it away from proper analysis and, as to the income indicator of value, from the actual words of the statute. The statutory directive is to consider what a hypothetical income for the property would be "if leased or rented to the public generally." ORS 308.490(2)(b). The court cannot see how the command to consider the public generally can be met by considering rental and other items received from the particular segment of the public composed of the elderly. This court has so concluded in *St. Catherine's Residence, Inc. v. Dept. of Rev.*, 14 OTR 500 (1998) and *Polk County v. Dept. of Rev. (II)*. Those are decisions from which the department offers no reason to depart, other than its flawed major premise that ORS 308.490 is a real market value statute. The court adheres to its analysis from those earlier cases on that point.[9]

B. *Annual Operating Expenses*

■ This court has stated that the operating expenses to be considered in the income indicator are those that would be needed "to maintain the property if it were rented to the public generally. Expenditures that are unique to housing for the elderly, such as housekeeping or assisted living care, should be eliminated from the calculations." *Polk County (II)*, 14 OTR at 571. The court sees no reason to depart from this approach.

C. *Reserves for Replacement and Insurance*

The parties appear to agree that there should be deductions for those items to the extent they relate to assets

---

[9] The court does not, however, adhere to the language in *St. Catherine's Residence, Inc.*, that property of the type in question "be valued at its real market value, not something less and not something more." Subsequent to *St. Catherine's Residence, Inc.*, this court acknowledged, in *Linus Oakes, Inc. v. Dept. of Rev.*, that ORS 308.490 is a form of special assessment statute when it concluded that a property that does not satisfy the requirements of ORS 307.375 "does not qualify for *special assessment* under ORS 308.490," and "must be assessed at its real market value." 15 OTR 186, 190 (2000) (emphasis added). In addition, the Oregon Supreme Court in *Gangle* recognized that ORS 308.490 is a type of special assessment statute. *See* note 6.

producing the *pro forma* gross income, that is, assets that would be used in renting to the public generally.

## D. *Depreciation*

The question of a deduction for depreciation in calculating *pro forma* income has been settled by the Oregon Supreme Court. *Gangle,* 320 Or at 498. The department argues, however, that if such a deduction is taken, "in order to insure that the result is the best approximation of market value, the depreciation component must be removed from the capitalization rate." As demonstrated by the department in its brief, however, a reduction in the capitalization rate tied to a deduction of depreciation from *pro forma* gross income would neutralize any effect for the depreciation deduction. This court cannot read the Supreme Court's decision in *Gangle* as permitting such a result. Further, the department appears to have as its basis for argument only its proposed view that the goal of the calculation is the best approximation of market value. The court rejects that view. The depreciation to be deducted should be "book" depreciation based on the original cost of assets used to provide housing to the public generally.

## E. *Taxes*

The parties appear to be in agreement that the only taxes to be considered are property taxes. They also appear to agree that the tax level to be considered is that which would apply if the property were rented to the public generally. In the court's view, the appropriate methodology here is to take no deduction for property taxes, but include an element for taxes in the capitalization rate.[10]

## F. *Capitalization Rate*

The parties appear to be in agreement that a market-derived capitalization rate for general housing properties should be used.

---

[10] As the court indicated in *Allen v. Dept. of Rev.*, 17 OTR 248 (2003), a different approach may be needed if the effects of Measure 50 are likely to decrease the actual amount of tax paid below the state's rate for the property.

## VI. RECONCILIATION

■ The taxpayer asserts that if the comparable sales and modified income indicators are different, an appraiser should reconcile to the lowest value. Not surprisingly, in light of its overall theory, the department asserts that any reconciliation should be to real market value. This court has previously concluded that, other things being equal, the modified income indicator should be given greater weight. *Polk County (II)*, 14 OTR at 573. The court adheres to that view, noting, however, that the facts of each case may show that "other things" are not equal.

## VII. CONCLUSION

For the reasons discussed above, the court makes the following preliminary conclusions. Now, therefore,

THE COURT CONCLUDES that, as indicated by ORS 308.490(2)(a), a comparable sales indicator is to be used. Sales of comparable elderly housing properties are to be used first, if available.

THE COURT FURTHER CONCLUDES that, in applying the modified income approach, gross income shall be determined by considering what a hypothetical income for the property would be if it were leased to the public generally, not if leased specifically to the elderly.

THE COURT FURTHER CONCLUDES that the annual operating expenses included shall be those encountered when renting property to the public generally, with those expenditures that are unique to providing housing for the elderly eliminated from the calculations.

THE COURT FURTHER CONCLUDES that reserves for replacement and insurance shall be deducted to the extent they relate to assets that would be used in renting to the public generally.

THE COURT FURTHER CONCLUDES that book depreciation, based on the original cost of assets used to provide housing to the public generally, shall be used.

THE COURT FURTHER CONCLUDES that no deduction for property taxes shall be taken, rather, taxes are to be included as an element in the capitalization rate.

THE COURT FURTHER CONCLUDES that a market-derived capitalization rate for general housing properties shall be used.

THE COURT FURTHER CONCLUDES that, all other things being equal, the modified income approach shall be given greater weight than the comparable sales approach.